**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER DEL PRETE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 17-cv-6145 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| VILLAGE OF ROMEOVILLE, | ) | |
| ILLINOIS, KENNETH KROLL, | ) | |
| SCOTT MCLAUGHLIN, UNKNOWN | ) | |
| OFFICERS OF THE ROMEOVILLE | ) | |
| POLICE DEPARTMENT, TRACEY | ) | |
| CALIENDO, the VILLAGE OF | ) | |
| PLAINFIELD, and DR. EMALEE | ) | |
| FLAHERTY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2005, plaintiff Jennifer Del Prete was convicted of first-degree murder for the death of an infant she had been caring for at the daycare center where she worked. The conviction was based solely on the state's theory that the child, "I.Z.," died from injuries associated with Shaken Baby Syndrome ("SBS"), and that Del Prete had inflicted those injuries. She was sentenced to 20 years in prison. After Del Prete served nearly half of that sentence, the Circuit Court of Will County vacated her conviction based on newly uncovered evidence suggesting that I.Z.'s SBS diagnosis was not as sound as presented at trial. In October 2022, the Will County State's Attorney dismissed the criminal case against Del Prete.

Del Prete sued. She asserts claims against the Village of Romeoville, Detective Kenneth Kroll, Detective Scott McLaughlin, and "unknown officers of the Romeoville Police Department" (the "Romeoville Defendants"); the Village of Plainfield and Tracey Caliendo (the "Plainfield

Defendants"); and Dr. Emalee Flaherty, the medical expert who testified at Del Prete's original criminal trial. Del Prete invokes 42 U.S.C. § 1983 and various state law theories in support of her claims. All defendants have moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth herein, the Romeoville Defendants' motion to dismiss is denied; the Plainfield Defendants' motion to dismiss is granted; and defendant Flaherty's motion to dismiss is denied.

## <u>BACKGROUND</u>

The following facts are drawn from Del Prete's Amended Complaint. In assessing motions brought under Rule 12(b)(6), the Court accepts as true all of the complaint's well-pleaded facts and draws all reasonable inferences therefrom in the plaintiff's favor. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). The Court also takes notice of the opinion of the Illinois Appellate Court affirming the decision of the Circuit Court of Will County to grant Del Prete's successive post-conviction petition, which is cited in Del Prete's Amended Complaint (*see* Am. Compl. ¶ 60, ECF No. 42), and is a matter of public record (*People v. Del Prete*, 2017 IL App (3d) 160535, 92 N.E.3d 435 (Ill. App. Ct. 2017)). *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (courts may consider public court documents in deciding motions to dismiss); *Fryman v. Atlas Fin. Holdings*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020) (courts may consider documents "referenced in the complaint and central to plaintiff's claims"). While the Court can take notice of the testimony recounted in that opinion, however, it cannot accept the truth of the testimony.

### *I.Z.'s Illness and Early Medical Testing*

On December 27, 2002, I.Z.'s mother dropped I.Z. and her sibling off at the daycare center where Del Prete worked. Am. Compl. ¶ 19. I.Z. was just three and a half months old at that time but had already experienced multiple health issues in her short life, including gastrointestinal

reflux, a fever that led to a short hospitalization, and, earlier that month, an ear infection requiring prescription medication. *Id.* ¶ 21. I.Z.'s mother had also apparently observed that I.Z. was "fussy" toward the end of December. *Id.*

The day started unremarkably. Del Prete cared for I.Z. throughout the day, feeding her and changing her diaper without incident. *Id.* ¶ 24. At some point, however, Del Prete picked I.Z. up out of the child swing where she was napping and laid her down on a couch for a diaper change, when she noticed I.Z. had diarrhea. *Id.* ¶¶ 24-25. I.Z. then began crying heavily and suddenly went limp, her breathing labored. *Id.* Del Prete attempted to resuscitate I.Z., checking to make sure she was not choking. *Id.* ¶ 26. Del Prete then called 911 and performed CPR until the paramedics arrived. *Id.* Detective McLaughlin of the Romeoville Police Department responded to the scene. *Id.* ¶ 27.

I.Z.'s initial treating physician told McLaughlin that the timeframe for the onset of I.Z.'s injuries was between 24 and 48 hours earlier—that is, prior to the time she had been in Del Prete's care that day. *Id.* ¶ 29. I.Z.'s CT scan also showed both chronic and acute subdural hematomas. *Id.* ¶ 28. Chronic subdural hematomas indicate bleeding in the brain that is weeks old. *Id.* After initial examination and treatment, I.Z. was transferred to UIC Hospital, where another doctor told Detective Kroll (who had joined the investigation as lead detective) that I.Z.'s symptoms immediately prior to Del Prete's performance of CPR were consistent with an Apparent Life-Threatening Event ("ALTE"). *Id.* ¶ 30. That doctor, Dr. Howard Hast, ordered tests to rule out the known natural causes of an ALTE. *Id.*

### Dr. Flaherty's Report

Del Prete alleges that in spite of the medical evidence pointing to possible causes of I.Z.'s injuries that were either natural or earlier in time than Del Prete's last contact with I.Z., Detectives

Kroll and McLaughlin reached out to Dr. Emalee Flaherty on January 3, 2003, to pursue charges against Del Prete. *Id*. ¶ 31. Dr. Flaherty was the Medical Director of the Protective Services Team at Children's Memorial Hospital in Chicago, and a prominent advocate for physicians partnering with law enforcement to investigate and prosecute child abuse cases. *Id*. ¶¶ 32-33. At the time of I.Z.'s medical issue, Flaherty had recently created a Child Protection Team Task Force to connect investigators of potential child abuse with medical experts to assist in identifying likely perpetrators. *Id*. ¶¶ 33-34. The Task Force specifically targeted babysitters and caretakers. *Id*. ¶ 35.

Del Prete alleges that Kroll, McLaughlin, and Flaherty conspired together to fabricate evidence against her. *Id*. ¶ 37. Specifically, Del Prete alleges that on January 8, 2003, without physically examining I.Z., Flaherty authored a report indicating that I.Z.'s injuries could only have been caused by shaking, that I.Z. had suffered only acute injuries, and that the injuries must have occurred immediately prior to her collapse—that is, while she was in Del Prete's care. *Id*. ¶¶ 38, 40. Each of those findings, Del Prete says, was fabricated and contradicted by medical evidence, known to Flaherty, Kroll, and McLaughlin, which showed that I.Z. had chronic (*i.e.*, non-acute) subdural hematomas indicating older bleeding and that I.Z.'s injuries could have been caused by an accident or possibly even natural causes.[1] *Id*. ¶¶ 40-42. The purpose of the Flaherty report was to ignore that evidence and point the finger at Del Prete for prosecution. *Id*. ¶ 39.

---

[1] The results of Dr. Hast's ALTE testing were not yet available to the detectives or Flaherty on January 8, 2003. Am. Compl. ¶ 42. The trial record, laid out in detail by the Illinois Appellate Court in *People v. Del Prete*, indicates that while Dr. Hast ultimately did rule out natural causes, he did not testify at trial as to a specific timeframe for suspected abuse. 2017 IL App (3d) 160535, ¶¶ 8, 54.

At that point, I.Z. was transferred to Children's Memorial Hospital, where Flaherty became personally involved in her care. *Id*. ¶¶ 44-45. Medical records after the transfer all include SBS or "non-accidental head trauma" as I.Z.'s diagnosis. *Id*. ¶ 45.

On February 10, 2003, based on Dr. Flaherty's assessment, Del Prete was charged with two counts of aggravated battery of a juvenile. *Id*. ¶ 46.

### *I.Z.'s Death and Autopsy*

On November 8, 2003, I.Z. died from complications related to her injuries. *Id*. ¶ 48. Dr. Jeff Harkey, a forensic pathologist employed by the DuPage County Coroner's Office, performed an autopsy of I.Z. *Id*. ¶ 49. Also present at the autopsy was Tracey Caliendo, an officer with the Plainfield Police Department. *Id*. ¶ 50.

During the autopsy, Dr. Harkey questioned I.Z.'s SBS diagnosis and indicated that he wanted to review her medical records to further evaluate her cause of death. *Id*. ¶ 49. Caliendo reported this to Kroll, but did not document it in a written report. *Id*. ¶¶ 50-51. Kroll, after learning of Harkey's questions from Caliendo, wrote to Flaherty on November 10, 2003:

> I'm writing to inform you of a "twist" in our case presented by the DuPage County Medical Examiner. On 11-09-03, I received a phone call from an Attorney who notified me that [I.Z.] would undergo a "post" medical exam on 11-10-03. This Attorney specifically called to inform me that the pathologist scheduled to perform the autopsy does not agree with SBS, and has testified for the defense in two DuPage County SBS cases. On 11-10-03, I spoke to a Plainfield Police Evidence Tech (ET) [Caliendo] who was present at the autopsy. The ET advised that Dr. Jeff Harky [sic] did in fact question the diagnosis of SBS. Dr. Harky specifically looked for fractures in the rib cage (adult grabbing point) and found none. Dr. Harky intends to summon[] all of [I.Z.'s] medical records to see who determined this was SBS, and why they reached that diagnosis. I have great confidence in your findings, and our investigation. This correspondence is FYI. However, I anticipate having to answer several questions for my prosecuting Attorney. Please call me when you have a few minutes to discuss the case.

5

Ex. A to Romeoville Defs.' Mem. in Support of Mot. to Dismiss, ECF No. 109 (hereinafter, the "Romeoville Mem."). This letter ("Kroll Letter 1") was never disclosed or produced to prosecutors or Del Prete during the criminal trial. Am. Compl. ¶ 53. Following the autopsy, Flaherty sent Harkey her report,[2] though *not* the complete medical records she referenced in authoring it. *Id*. ¶ 54. In doing so, Del Prete alleges, Flaherty "insulate[d]" her fabricated SBS diagnosis, eliminating any evidence to the contrary for Harkey's analysis. *Id*. Harkey did, in fact, rely on Flaherty's report, and testified at Del Prete's trial that I.Z.'s cause of death was "abusive head trauma" from December 27, 2002. *Id*. ¶ 55. At Del Prete's post-conviction hearing, Dr. Harkey testified that had he known about I.Z.'s chronic subdural hematoma, he would have disagreed that her injuries must have been caused by whoever was with her when she collapsed. *Del Prete*, 2017 IL App (3d) 160535, ¶¶ 31, 34.

At trial, there were no eyewitnesses to I.Z.'s alleged murder presented, nor did Del Prete ever confess to murdering I.Z. Am. Compl. ¶ 49. Based on the SBS diagnosis, and Flaherty's testimony that the injuries must have been caused by an adult shaking her, Del Prete was convicted of first-degree murder and sentenced to 20 years in prison. *Id.* ¶¶ 21, 49.

### *Discovery of the Kroll Letters*

In March 2013, journalism students from the Medill Justice Project at Northwestern University received a copy of Kroll Letter 1 in materials received in response to a Freedom of Information Act request filed with the Romeville Police Department. *Id*. ¶ 59. Based on the newly uncovered letter, Del Prete filed a successive post-conviction petition, alleging a *Brady* violation. *Del Prete*, 2017 IL App (3d) 160535, ¶ 1. On August 29, 2016, the Circuit Court of Will County

---

[2] The complaint does not allege whether Harkey requested the report or Flaherty sent it to him on her own initiative. Nor does the complaint allege whether Harkey received any other records from Flaherty with the report.

vacated Del Prete's conviction and ordered a new trial. Am. Compl. ¶ 61. The Illinois Appellate Court affirmed. *Del Prete*, 2017 IL App (3d) 160535, ¶ 59.

While the new trial was pending, another letter written by Kroll ("Kroll Letter 2") came to light. This letter was dated April 24, 2014, and was addressed to the Romeoville Police Department and the Will County State's Attorney's Office. Am. Compl. ¶ 62. In it, Kroll addressed Del Prete's pending release from custody and the discovery of Kroll Letter 1, confirming he had learned that Dr. Harkey questioned the SBS diagnosis. Ex. B to the Romeoville Mem.. Kroll also stated in the letter that while he believed that Del Prete caused I.Z.'s injuries, he did not believe that she did so intentionally. *Id*.

Eventually, in October 2022, the state moved to *nolle prosequi* its case against Del Prete because prosecutors believed that, in light of a "newly obtained expert opinion" and "all of the other physician and opinion evidence in the case," they could not "sustain their burden of proof beyond a reasonable doubt." Ex. C to the Romeoville Mem.. The case was dismissed.

## ANALYSIS

Del Prete alleges that the defendants conspired to frame her for I.Z.'s death. That is her only claim,[3] and it is important, in considering a motion to dismiss a complaint for failure to state a claim for relief, to distinguish between her claim and the legal theories she invokes in support of

---

[3] This characterization is not an oversimplification. *See*, *e.g.*, *Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019) ("It is important to clarify that although the parties occasionally refer to [Plaintiff's] '*Brady* claims' or 'identification procedure claim,' his allegations do not give rise to separate claims under section 1983. [Plaintiff] has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights."); *see also ACF 2006 Corp. v. Mark C. Ladendorf, Att'y at L., P.C.*, 826 F.3d 976, 981 (7th Cir. 2016) (approving of statement of the plaintiff's claim as, "Their trust funds were plundered, and they want recompense," and distinguishing that claim from the reasons the plaintiffs might be entitled to recompense (*i.e.*, legal theories), which "need not be pleaded, because complaints need not cite authority or set out a line of legal argument").

that claim. A "claim is the aggregate of operative facts which give rise to a right enforceable in the courts." *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) (quotation omitted). "Counts" are the authorized device for asserting distinct claims—that is, claims "founded on a separate transaction or occurrence," *see* Fed. R. Civ. P. 10(b)—but as here, are often employed to assert different legal theories in support of a claim.[4] A "complaint need not identify a legal theory, and specifying an incorrect theory is not fatal," *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir. 1992), but no matter how many legal theories, or "counts," a plaintiff may assert, they constitute a single "claim" to the extent they are premised on the same facts. "[D]ifferent legal theories . . . do not multiply the number of claims for relief." *NAACP v. Am. Fam. Mut. Ins. Co.,* 978 F.2d 287, 292 (7th Cir.1992); *see also id.* ("One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate.").

The distinction between claims and legal theories is important because Rule 12(b)(6) permits only the dismissal of claims, not legal theories. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). "[A] complaint cannot be dismissed merely because one of the theories on which it proceeds, and the facts alleged in support of that theory, do not make out a claim for relief." *Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 727 (7th Cir. 1986). To the extent that any viable legal theory exists to support a claim, that claim will survive a motion to

---

[4] Though a common practice, setting forth legal theories in separate counts is inconsistent with the federal pleading rules. As Judge Shadur explained in *Bonestroo, Rosene, Anderlik & Associates v. Devery*, "the use of separate counts to set out different theories of recovery is a mistaken manifestation of the state law 'cause of action' approach, rather than the federal concept of 'claim for relief.'" No. 05-cv-02184, 2006 WL 1005284, at *11 (N.D. Ill. Apr. 12, 2006) (citing *NAACP v. Am. Fam. Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir.1991)).

dismiss. *See Richards v. Mitcheff*, 696 F.3d 635, 638 (7th Cir. 2012); *Croixland Props. Ltd. v. Corcoran*, 174 F.3d 213, 218 (D.C. Cir. 1999) ("[I] f one of the theories can survive a Rule 12(b)(6) motion, the district court cannot dismiss the complaint."); *Churchwick Partners, LLC v. Seal Keystone, LLC*, No. 22-cv-02251, 2023 WL 2973801, at *2 (S.D. Ind. Apr. 17, 2023) ("A Rule 12(b)(6) motion cannot be used to dismiss individual legal theories advanced in support of a claim, so long as at least one theory, implicit or explicit, remains[.]").

The time for identifying and testing the viability of legal theories comes after pleading and responding to the complaint, during discovery and the summary judgment process. *ACF 2006 Corp. v. Mark C. Ladendorf, Att'y at L., P.C.*, 826 F.3d 976, 981 (7th Cir. 2016) ("Making legal arguments in support of one's claim comes after the pleadings."); *BBL,* 809 F.3d at 325 ("Summary judgment is different. The Federal Rules of Civil Procedure explicitly allow for '[p]artial [s]ummary [j]udgment' and require parties to 'identif[y] each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought.'") (alterations in original) (quoting Fed. R. Civ. P. 56(a)); *Alioto v. Town of Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery."). At this stage, it is enough to plead a plausible claim, after which "a plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (quoting *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)). "A full description of the facts that will prove the plaintiff's claim comes later, at the summary-judgment stage or in the pretrial order." *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017).

"What this all means is that when two theories based on the same facts—and part of a single claim for relief—are presented in a complaint, and a defendant only challenges the

sufficiency of the complaint as to one of the theories, the claim cannot be dismissed." *Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs*, 197 F. Supp. 3d 1334, 1341 (N.D. Fla. 2016). "And the challenged *theory* can't be dismissed, either, because dismissal of theories (as opposed to claims) is inappropriate at the motion to dismiss stage." *Id.* (emphasis in original). So here, where the plaintiff has asserted a single claim—that the defendants framed her for I.Z.'s murder—and multiple legal theories that may entitle her to relief on that claim, the defendants face the challenging task of demonstrating that there is no legal theory under which Del Prete is entitled to relief. If even one of Del Prete's legal theories plausibly gives rise to a claim for relief, then it does not matter whether the rest of the theories she has advanced, or any theory she has not advanced, would succeed or fail. If just one theory could entitle her to relief, the complaint cannot be dismissed.

Though not required to set forth any legal theories in support of her claim, Del Prete asserts both federal and state law theories of liability. Invoking federal law, she asserts that the defendants deprived her of due process by: (1) withholding exculpatory evidence, (2) fabricating evidence, (3) maliciously prosecuting her, and (4) failing to intervene. She also maintains that the defendants (5) conspired to deprive her of due process, and (6), as to the municipal defendants, maintained policies and practices that gave rise to those constitutional violations. Invoking state law, Del Prete advances several additional theories of liability, including malicious prosecution, intentional infliction of emotional distress, civil conspiracy, *respondeat superior*, and indemnification pursuant to 745 Ill. Comp. Stat. 10/9-102. Although the Court need only identify one legal theory that plausibly supports a claim for relief, the following review concludes that all but two of the theories Del Prete identifies suffice to allow her claim to go forward against the Romeoville

Defendant and Flaherty. No theory has been identified to sustain a claim against the Plainfield Defendants.

## I.     Withholding Exculpatory Evidence: *Brady*

Del Prete alleges that the defendants deprived her of a fair trial by withholding exculpatory evidence—that is, Kroll Letter 1, Kroll Letter 2, and the information contained therein—in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). To state a claim based on *Brady*, a plaintiff must allege: "(1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence [was] suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'" *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2009). The parties do not dispute that Del Prete has satisfied the first two elements but differ in their views of the materiality of Kroll Letter 1 and Kroll Letter 2.

### A.     Kroll Letter 1

#### 1.     Defendants Kroll, McLaughlin, and Flaherty

Defendants Kroll, McLaughlin, and Flaherty argue that qualified immunity shields them from liability for the failure to disclose Kroll Letter 1 because it contains inadmissible hearsay, and it was not clear at the time Del Prete was tried and convicted that, in the Seventh Circuit, inadmissible hearsay was material under *Brady*. "An official is entitled to qualified immunity for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015) (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Whether or not qualified immunity protects an official is a two-part inquiry which asks if the plaintiff has alleged the deprivation of a constitutional right and if that

constitutional right "was clearly established at the time and under the circumstances presented." *Beaman*, 776 F.3d at 508. A plaintiff can show that a right is "clearly established" by either pointing to "a clearly analogous case establishing the right to be free from the conduct at issue," or by showing that "the conduct was so egregious that no reasonable person could have believed that it would not violate established rights." *Id.* (quotation omitted).

It is not disputed that the obligation of police officers to turn over exculpatory material to prosecutors has been "clearly established" since well before 2005. *See Beaman*, 776 F.3d at 509 ("[I]t is true that the idea that police officers must turn over materially exculpatory evidence has been on the books since 1963[.]"); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) ("[I]t [was] clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup[.]"), *abrogated on other grounds by Manuel v. City of Joliet*, 580 U.S. 357 (2017).

The defendants do not maintain that they disclosed the information about Harkey's skepticism concerning the SBS determination. They argue, rather, that they are entitled to qualified immunity because the Kroll letters are inadmissible hearsay and the long-standing *per se* rule in the Seventh Circuit is that inadmissible evidence cannot be material for purposes of a *Brady* claim. *See United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014) (compiling cases); *see also Ruffin v. Mitchell*, No. 20-cv-50050, 2021 WL 2809525, at *9 (N.D. Ill. Jul. 6, 2021) ("The Seventh Circuit . . . holds that inadmissible evidence cannot be material.").

The Seventh Circuit's rule is premised on *Wood v. Bartholomew*, a 1995 Supreme Court habeas decision holding that a polygraph report, which showed a key witness failing certain questions regarding his own participation in the plaintiff's crime, was not material under *Brady* because polygraph results were inadmissible in the trial court's state. 516 U.S. 1, 6 (1995). As

Kroll and McLaughlin point out, the Seventh Circuit has read the *Wood* decision to foreclose the possibility of inadmissible evidence being *Brady* material. *See Morales*, 746 F.3d at 314 ("In a number of decisions, we have understood the Court to be saying that suppressed evidence must be more than material to guilt or punishment—it must actually be admissible in order to trigger *Brady* analysis.").[5]

The *Wood* Court did not end its analysis at inadmissibility, however. Rather, it proceeded to analyze whether the polygraph report, even if hypothetically admissible, was "reasonably likely" to lead to "a different outcome at trial." *Wood*, 516 U.S. at 8. The Court concluded that the inadmissible report was not likely to have made a difference at trial because there was "overwhelming" additional evidence against the plaintiff and testimony from his trial counsel that access to the report would not have changed the scope of his cross-examination of the polygraphed witness. *Id*. at 7-8.

The First, Second, Third, Sixth, and Eleventh Circuits have read this latter half of the *Wood* ruling to mean that inadmissible evidence may be material under *Brady* "if it could have led to the discovery of admissible evidence." *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013); *see also Morales*, 746 F.3d at 314 (compiling cases and summarizing majority position).[6] In fact, the Seventh Circuit acknowledged its minority position on the issue in *Morales*, in which a defendant convicted of mail fraud alleged that an email sent by the investigating secret service agent to the

---

[5] This can only mean that the government's disclosure must identify or describe admissible evidence; it cannot mean that each document included in the disclosure must itself be admissible. Were that the case, a police report setting forth an exculpatory fact provided by an eyewitness would not have to be disclosed because the report itself was hearsay. *See Goudy v. Basinger*, 604 F.3d 394, 401 (7th Cir. 2010) (ruling that police reports, containing eyewitness statements, were potentially material under *Brady*, without addressing admissibility or *Wood*).

[6] The Fourth Circuit shares the minority view with the Seventh. *See Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir.1996).

government, which contained a hearsay statement from the defendant's daughter, was material under *Brady* and, among other suppressed evidence, warranted a new trial. 746 F.3d at 313. The Seventh Circuit held that while "[w]e find the Court's methodology in *Wood* to be more consistent with the majority view in the courts of appeals than with a rule that restricts *Brady* to formally admissible evidence," it was "not the occasion" to overturn the Circuit's existing *per se* rule because the email in question "could have had no discernible effect on the trial" and was therefore not *Brady* material under any approach to admissibility. *Id*. at 315-317. So, the *per se* rule against inadmissible evidence as *Brady* material still stands in this Circuit, however precariously. More importantly with respect to Kroll and McLaughlin's qualified immunity defense, that was the Seventh Circuit rule in 2005, when Del Prete was on trial. Kroll and McLaughlin are correct in their assertion that it was not clearly established in 2005 that officers were obligated to turn over inadmissible hearsay.

Accordingly, the threshold question for the qualified immunity defense asserted by Kroll and McLaughlin is whether the statements reported by Kroll Letter 1 would have been admissible at Del Prete's criminal trial had they been offered. In making that assessment, it is important to understand that, as a constitutional matter, *Brady* disclosures are not required to be made before trial; "*Brady* is a disclosure requirement rather than a discovery requirement." *United States v. Dixon*, 790 F.3d 758, 759 (7th Cir. 2015). And "[u]ntil a trial has been held, it is not possible to be sure what will and will not be disclosed or whether any non-disclosure is material." *Evans v. Cir. Ct. of Cook Cnty.*, 569 F.3d 665, 667 (7th Cir. 2009). The admissibility of the statements in Kroll Letter 1, then, is measured against the evidence that was presented at trial. Relatedly, admissibility must be assessed based on Illinois' evidentiary rules, as Del Prete was tried in state, not federal, court.

Unfortunately, and underscoring the difficulty of the *per se* rule, the Court cannot always say with any degree of certainty whether or not evidence would have been admissible. As the following discussion suggests, there are simply too many unknown variables and discretionary judgments that go into a decision to admit evidence.

Kroll Letter 1 contains several layers of possible hearsay: Kroll describes to Flaherty (layer 1) what Caliendo told him (layer 2) about what Dr. Harkey said during the autopsy (layer 3) about his suspicions of I.Z.'s SBS diagnosis.[7] While each of these statements may appear facially to be hearsay, there are arguments to be made for admitting them all at trial. At layer 1 (Kroll's statements to Flaherty), Kroll testified at trial that he told Del Prete during her interrogation that "medical evidence" indicated she had injured I.Z. by shaking her. *Del Prete*, 2017 IL App (3d) 160535 ¶ 6. That testimony is in tension with Kroll's assertion in his letter that he had learned that Harkey questioned the SBS diagnosis; the letter's statement, therefore, is arguably a prior inconsistent statement by a witness, and not hearsay under Illinois' rules. *See* Ill. R. Evid. 801(d)(1)(A)(2)(a)-(b) (a statement is not hearsay if it is inconsistent with a declarant's testimony, describes an event or condition of which the declarant had personal knowledge, and is proved to have been written by the declarant or acknowledged by the declarant under oath). Or the statement could also have been used for impeachment purposes pursuant to Ill. R. Evid. 613(b), which provides for the admission of prior inconsistent statements solely for impeachment purposes. *See People v. Brock*, 2022 IL App (3d) 200430 ¶ 68, 227 N.E.3d 580, 597 (Ill. App. Ct. 2022); *see*

---

[7] For purposes of this motion, the Court ignores the first part of Kroll Letter 1, which reports what an unnamed attorney told Kroll about Dr. Harkey before the autopsy was performed. While that information may also have been materially favorable to Del Prete, it appears at this juncture to be less material than the information Caliendo relayed to Kroll after the autopsy. If the latter fails to carry the day for Del Prete's *Brady* claim, the attorney's warning presumably also falls short.

*also* Victor J. Gold, 28 *Wright & Miller's Federal Practice and Procedure* § 6206 (West 2024) ("Where a prior inconsistent statement is offered only to impeach, it is not hearsay since it merely shows the witness is unreliable and says nothing about the truth of the facts asserted in the statement.").

Layer 2 (Caliendo's statement to Kroll) is more speculative, since Caliendo, so far as the Court can tell, did not testify at trial. Had Del Prete had access to Kroll Letter 1, she could have called Caliendo as a witness and questioned her about her presence at the autopsy and subsequent discussions with Harkey and Kroll. But whether or not Caliendo's statements, as conveyed by the letter, could have been used depends on what Caliendo would have said on the stand and how Del Prete proposed to use them.

With respect to the statements at layer 3 (Harkey's statements during the autopsy), those statements were likely not hearsay because they were relevant not to prove the truth of any assertion of fact they contained—they contained no such assertions—but to show that Harkey questioned the SBS diagnosis. Kroll Letter 1 related only that Harkey "did in fact question the diagnosis of SBS," but that description does not report anything that Harkey actually said; what is reported is Caliendo's assessment that Harkey had "questions" about the SBS diagnosis. A question is not hearsay. *United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006) (defendant's "remark was not a statement, it was a question."); *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("[I]f the statements were questions or commands, they could not—absent some indication that the statements were actually code for something else—be offered for their truth because they would not be assertive speech at all. They would not assert a proposition that could be true or false."); *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute

16

hearsay.").[8] It is possible, of course, that Harkey made some assertive statement during the autopsy (*e.g.*, "The diagnosis of SBS is inconsistent with my examination."), but Caliendo's report is the only evidence available as to what Harkey said and her report does not include any statement Harkey made that would be offered for its truth.

The only other statement of Harkey reported in Kroll Letter 1 is that Harkey "intends to summon[] all of [I.Z.]'s medical records." Here, again, what is reported is not an assertion of fact, but an intention. More significantly, this statement—if it is a statement—is not offered for its truth; its relevance lies not in whether Harkey actually intended to subpoena all of I.Z.'s medical records, but in the fact that something to that effect was said. The relevance of a statement by Harkey during the autopsy that "I intend to subpoena all of I.Z.'s medical records" is not whether he actually intended to do so, but that he had concerns about the validity of the diagnosis.

Further, Harkey testified at trial that he believed that I.Z.'s cause of death was "abusive head trauma" that occurred on December 27, 2002. Like Kroll's statements in layer 1, to the extent that Harkey would be deemed to have made statements about I.Z.'s death as opposed to questions, Harkey's statements, as reflected in the letter, were prior statements, inconsistent with his testimony, and thus not hearsay, assuming he acknowledged making the statement at trial. Ill. R. Evid. 801(d)(1)(A)(2)(b). Had Kroll Letter 1 been timely disclosed, Del Prete's counsel would also have been permitted to question Harkey about whether he had made any prior inconsistent statement pursuant to Ill. R. Evid. 613 to impeach his testimony about I.Z.'s cause of death. And

---

[8] While the Court is unaware of an Illinois state court expressly ruling that questions are not hearsay, it is also unaware of any ruling to the opposite effect. Further, while Illinois state courts are not bound by federal evidentiary rules, federal court decisions "can provide guidance and act as persuasive authority." *Lucas v. Tyler*, 349 Ill. App. 3d 995, 1002, 812 N.E.2d 72, 78 (Ill. App. Ct. 2004).

prior inconsistent statements are, of course, a type of evidence that is subject to disclosure under *Brady*. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

Moreover, while Kroll Letter 1 does contain out-of-court statements, the statements in the letter also could have been offered at trial not for their truth, but for the effect they had on those to whom they were made and to explain their course of conduct afterward. *See Sangster*, 2014 IL App (1st) 113457 ¶ 78, 8 N.E.3d 1116, 1132 (Ill. App. Ct. 2014) (out-of-court statement by gunshot victim about identity of shooter properly admitted to explain listener's subsequent conversation with alleged shooter); *People v. Carroll*, 322 Ill. App. 3d 221, 223, 751 N.E.2d 44, 46 (2001) (out-of-court statement by unidentified man inviting defendant onto property admitted not for truth, but to explain defendant's reason for alleged criminal trespass). What Kroll and Faherty did after receiving a report contradicting their theory of the cause of death—for example, discussing what medical reports to send to Harkey—would likely be relevant evidence as to the soundness of Harkey's testimony.

While the foregoing analysis identifies reasons that the statements included within Kroll Letter 1 *could* have been admitted at Del Prete's trial, the Court readily acknowledges that trial courts have discretion over the admissibility of evidence, and it is not certain that the letter's statements would have been allowed. Further, it is unrealistic to expect police officers to master the rules of evidence when assessing whether information they have discovered constitutes *Brady* material. Even when addressed by courts, there will often be no clear answer to whether information is admissible; there is a reason that the abuse of discretion standard governs appeals of evidentiary rulings. What is more, there is no guarantee that the analysis will not change before or during trial. Often, the question may not even be answerable until the trial is underway and the purpose for offering the statement at issue becomes clear.

While the statements set forth in Kroll Letter 1 hypothetically satisfy admissibility requirements, it is impossible to say with certainty that they would have been admissible at trial. Indeed, given the vagaries of whether information will be admissible in evidence at trial, the Court agrees with the *Morales* court's view that *Wood* does not restrict *Brady* to formally admissible evidence. But the court's view was not its ultimate holding. It bears noting that *Morales* itself also dealt with an email containing an out-of-court statement that hypothetically could have had permissible uses at trial. Had the email been turned over, the declarant could have been called as a witness, and defense counsel may well have been able to question her about the statement via impeachment or another avenue. But the *Morales* Court found that the email contained hearsay, and therefore could not be *Brady* material, and district courts are bound by Circuit precedent. Kroll Letter 1 contains hearsay, and the Court therefore finds that defendants Kroll, McLaughlin, and Flaherty are entitled to qualified immunity from Del Prete's claim insofar as it rests on a *Brady* violation.[9]

### 2. Defendant Caliendo

Del Prete alleges that Caliendo was present during the autopsy and that Harkey's concerns about I.Z.'s SBS diagnosis were "not included in her Plainfield Police Department reports, or disclosed to Plaintiff or prosecutors during the criminal proceedings." Am. Compl. ¶¶ 50-51. Del Prete describes this as "improperly suppressing" evidence. *Id*.

Like defendants Kroll, McLaughlin, and Flaherty defendant Caliendo argues that qualified immunity shields her from Del Prete's due process claims because of the inadmissible hearsay in Kroll Letter 1. For the reasons detailed above, the Court accepts that argument.

---

[9] The Court addresses defendant Flaherty's remaining immunity arguments in Section IX.

Caliendo presses the additional immunity ground that it was not clearly established at the time of the autopsy that she was obligated to do more than simply share Harkey's observations with Kroll, the lead detective overseeing the investigation. Del Prete's complaint suggests Caliendo's failure to include Harkey's concerns in a written police report constituted a *Brady* violation. In her response brief, Del Prete takes an even broader view, and argues that *Brady* obligated Caliendo to ensure that the potentially exculpatory information she learned from Dr. Harkey was conveyed to prosecutors regardless of whether it was memorialized in writing or shared another way.

Caliendo is also entitled to qualified immunity as to this theory. To the extent Del Prete argues that Caliendo's failure to memorialize Harkey's concerns was a clearly established constitutional violation, she falls short. Del Prete does not point to any case suggesting that it was "clearly established" by 2005 that Caliendo was obligated to document the details of the autopsy in a police report, or share them directly with prosecutors or Del Prete instead of the lead detective. To the contrary, Seventh Circuit law "makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015).

In addition, Del Prete's claim against Caliendo under *Brady* fails on the merits. Del Prete does not allege any facts that link Caliendo to the prosecution team to which *Brady* obligations would extend. *See United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996) (*Brady* obligations extend to "the prosecution team, which include[s] investigating officers and agents"). "[T]he instances in which the Seventh Circuit has entertained a *Brady* claim under § 1983 against individuals other than prosecutors all evince a close relation between the defendant and the

20

underlying investigation and prosecution." *Chatman v. City of Chicago*, No. 14-cv-02945, 2016 WL 4734361, at *3 (N.D. Ill. Sept. 12, 2016) (officials with the Office of Professional Standards did not have a duty to disclose potentially exculpatory material because they did not "actively investigate[]" the plaintiff in advance of his criminal prosecution). Further, "whether someone is part of the prosecution team depends on the degree of interaction between the prosecutor and the agency or individual. . . . At its core, members of the team perform investigative duties and make strategic decisions about the prosecution of the case [or] perform tasks at the prosecution's request." *United States v. Linder*, No. 12-cr-00022, 2013 WL 812382, at *34 (N.D. Ill. Mar. 5, 2013) (cleaned up). Del Prete's complaint provides no explanation for why Caliendo was present at the autopsy, makes no additional allegations regarding her involvement with the investigation or prosecution of Del Prete, and does not suggest in any way that Caliendo was taking direct orders from Kroll, McLaughlin, or prosecutors in the case. Kroll, in Kroll Letter 1, only identifies Caliendo as an "Evidence Tech" and gives no context for her role in the case other than her presence at the autopsy. Ex. A to the Romeoville Mem.. Without more, the facts Del Prete alleges with respect to Caliendo are too tangential to the prosecution to further extend *Brady* obligations to her. Del Prete has therefore not made out a claim against Caliendo on the basis of *Brady*.

**B. Kroll Letter 2**

The Romeoville Defendants argue that Kroll Letter 2 cannot constitute *Brady* material because it was written on April 24, 2014, and therefore did not exist at the time of Del Prete's trial. Del Prete echoes her arguments with respect to Kroll Letter 1, asserting that it is the information conveyed by Kroll Letter 2 that was improperly suppressed. That is, if Kroll believed, as he wrote in Kroll Letter 2, that Del Prete did not intentionally cause I.Z.'s injuries—meaning he did not think she was guilty of first-degree murder, which requires a showing of intent—Del Prete was entitled to know that information at the time of her trial. Del Prete theorizes that "[i]t would have

been devastating cross-examination if . . . defense counsel had been able to elicit from Kroll that despite his investigation as a whole, he still did not believe that [Del Prete] intended to harm I.Z." Pl.'s Cons. Resp. to Mots. to Dismiss 17-18, ECF No. 118 (hereinafter, "Pl.'s Resp.").

But not surprisingly, Del Prete does not point to a single case supporting her contention that a police officer's subjective beliefs about the defendant's state of mind, guilt, or innocence, are material *Brady* evidence, let alone one so holding in 2005. It is difficult to imagine there could be such a case. A police officer's opinion of guilt or innocence is not relevant evidence and is therefore inadmissible. *See generally* Ill. R. Evid. 401, 701; Fed. R. Evid. 401, 701. Just imagine what a contrary rule—treating on officer's opinion concerning guilt as relevant—would require: a pretrial assessment of the subjective opinion of every officer involved in the investigation of the case about the defendant's guilt or innocence. Inviting the police to testify about their subjective evaluation of the evidence would be no less problematic than having prosecutors do so, and that practice is plainly forbidden. *United States v. Young*, 470 U.S. 1, 18 (1985) (explaining the dangers of prosecutor vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused).

The suppression of Kroll Letter 2, therefore, does not give rise to a claim under *Brady*.

## II. Evidence Fabrication

Del Prete also alleges that the defendants deprived her of a fair trial by fabricating evidence. She maintains that Dr. Flaherty's opinion, memorialized in her early 2003 report, that I.Z. could have been injured *only* by abuse inflicted by Del Prete on December 27, 2002, was contradicted by medical evidence known to Flaherty, Kroll, and McLaughlin. Those defendants counter that Del Prete's claim cannot constitute evidence fabrication because (1) Flaherty's report was not admitted at Del Prete's trial and (2) Flaherty's report constitutes a medical opinion, which cannot

be "fabricated" in the same way that, for example, a lineup might be manipulated or a piece of crime scene evidence planted. The Court is not persuaded by the defendants' arguments.

First, Del Prete's complaint alleges that Flaherty, with the knowledge and cooperation of Kroll and McLaughlin, "fabricated" her opinion by misrepresenting it. She alleges that Flaherty, Kroll, and McLaughlin knew that I.Z.'s initial medical testing indicated that the baby's injuries had occurred prior to Del Prete's last interaction with her and were possibly the result of natural causes. *See* Am. Compl. ¶¶ 31, 41-42. Del Prete then alleges that, despite knowing of that potentially exculpatory evidence, Flaherty authored a medical report with unequivocal findings that "(1) shaking was the only possible cause of I.Z.'s injuries; (2) I.Z. had suffered only acute injuries; and (3) I.Z.'s injuries must have occurred immediately prior to I.Z.'s collapse." *Id*. ¶ 40. The complaint continues: "Flaherty knew that each of [those] statements was false." *Id*. ¶ 41. Such allegations are sufficient to state a claim for evidence fabrication. *See Liebich v. DelGiudice*, No. 20-cv-02368, 2021 WL 1103346, at *2, 5 (N.D. Ill. Mar. 22, 2021) (denying motion to dismiss brought by defendant doctors whom plaintiff alleged conspired with investigators to "provide false reports and opinions to point the finger" at him).

Despite its tortured procedural history, *Stinson v. Gauger* also supports Del Prete's fabrication theory. In that case, two forensic odontologists drafted reports opining that the bite marks collected from a murder victim's body matched tooth molds made from the plaintiff's teeth, leading to the plaintiff's conviction for the murder. 868 F.3d 516, 520-521 (7th Cir. 2017). Years later, a panel of additional odontologists reviewed the evidence and concluded the plaintiff could not have made the bite marks on the victim's body, and the plaintiff's conviction was vacated. *Id*. at 521. The plaintiff sued, and the district court denied the defendants' motion for summary judgment on the issue of qualified immunity because the odontologists' "conclusions were far

23

afield of what a reasonable forensic odontologist would have concluded." *Stinson v. City of Milwaukee*, No. 09-cv-01033, 2013 WL 5447916, at *18 (E.D. Wis. Sept. 30, 2013). A panel of the Seventh Circuit, however, overruled that decision, finding that the defendants were entitled to summary judgment because even though other experts had found the odontologists' determinations to be unreasonable, nothing in the record suggested they had truly *fabricated* their opinions: "Fabricated opinion evidence, for which the expert might not have qualified immunity, must be both wrong and known to be wrong by the expert." *Stinson v. Gauger*, 799 F.3d 833, 843 (7th Cir. 2015). On rehearing *en banc*, the Seventh Circuit reversed that decision, finding the panel had lacked jurisdiction to hear the issue. *Stinson*, 868 F.3d at 528. Technically, then, the district court's decision denying the defendants' motion for summary judgment as to evidence fabrication stands. But even looking to the Seventh Circuit's more stringent, objective standard for opinion evidence fabrication, Del Prete has stated a claim. Del Prete alleges that Flaherty's report stated without caveat that SBS, suffered immediately prior to her collapse while in Del Prete's care, was the only possible cause of I.Z.'s injuries. Am. Compl. ¶ 40. Del Prete also alleges that Flaherty knew that I.Z.'s medical tests indicated there were other possible causes (*id*. ¶ 41), and therefore that the opinions set forth in her report were both "wrong and known to be wrong by the expert." *Stinson v. Gauger*, 799 F.3d at 843.[10]

The Romeoville Defendants argue that because Flaherty's report was not actually admitted at trial, Del Prete's evidence fabrication theory fails. But that is not the correct standard. Del Prete

---

[10] For this reason, the Court also rejects Flaherty's argument that she had no personal involvement in any constitutional deprivations. Flaherty argues that "Plaintiff's ultimate grievance is that the prosecutor did not turn over evidence to Plaintiff in her criminal trial and that the coroner did not express his own opinions at the trial." Flaherty Memo in Support of Mot. to Dismiss 15, ECF No. 113 (hereinafter, "Flaherty Mem."). But this argument fails to recognize Del Prete's evidence-fabrication claim, a scheme in which Del Prete alleges Flaherty played a central role.

need only show that the report—or more precisely, Dr. Flaherty's allegedly fabricated opinion—was *used* against her at trial. *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) (trial court's fabrication-of-evidence instruction erroneous because it did not explain the plaintiff "had the burden to prove that the fabricated evidence was used against him at his criminal trial and was material"); *see also Taylor v. City of Chicago*, No. 14-cv-00737, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) (where allegedly fabricated report "was discussed at length during [defendant's] cross- and redirect examinations, including by reference to the document itself, which was used to refresh [the defendant's] recollection," the plaintiff had shown the report was "used" against him at trial). Indeed, the only case defendants cite for the proposition that fabricated evidence must be formally admitted or introduced at trial is *Brown v. City of Chicago*, a case which is not only not binding on this Court but involved allegedly fabricated police reports that were neither admitted into evidence nor used to refresh any witness' recollection during trial. 633 F. Supp. 3d 1122, 1159-60 (N.D. Ill. 2022).

Del Prete's complaint lacks detail as to how, and to what extent, Dr. Flaherty's findings were used during trial, but it does allege that the "Defendant Officers submitted Defendant Flaherty's fabricated report and Dr. Harkey's autopsy, which was in turn based on that fabricated report" and that "[t]he inquest returned a verdict of homicide." Am. Compl. ¶ 57. In addition, the Illinois Appellate Court's post-conviction ruling details how Flaherty's report was referenced during Harkey's testimony and that "his conclusion that I.Z. suffered AHT was due to Flaherty's report." *Del Prete*, 2017 IL App (3d) 160535, ¶ 9. The appellate court's description of the trial testimony also reflected that Flaherty testified extensively as to her opinions regarding I.Z.'s cause of death. *Id.* ¶¶ 10-14. This account of the trial testimony plausibly shows that Flaherty's allegedly

fabricated opinion that I.Z. could have died only of AHT suffered on December 27, 2002 was used during the trial.

Del Prete's complaint therefore holds up under an evidence-fabrication theory.[11]

### A. Defendant McLaughlin

Defendant McLaughlin argues that Del Prete has not adequately pleaded that he was personally involved in the alleged constitutional violations. "Though liability under § 1983 depends on personal involvement in an alleged constitutional violation . . . 'an official satisfies the personal responsibility requirement of section 1983 . . . if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent.'" *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1021 (N.D. Ill. 2003) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)) (allegation that defendant officers "acted jointly and in concert, with the intent and effect of harming [plaintiff] and depriving him of constitutionally protected rights" was sufficient to plead the officers' individual involvement).

While McLaughlin is right that a defendant named in a § 1983 suit is "entitled to notice of the wrongs with which he is charged," *Watt v. City of Highland Park*, No. 98-cv-08123, 2001 WL 1090152, at *2 (N.D. Ill. Sept. 13, 2001), he fails to acknowledge Del Prete's allegations with respect to his role in the alleged scheme to frame Del Prete. More than general allegations of conspiracy, Del Prete alleges that he "responded to the scene" of I.Z.'s illness, that he spoke with I.Z.'s initial treating physician and learned the important exculpatory information that the "the timeframe for the onset of the injuries was at least 24 and up to 48 hours prior to that date," that

---

[11] Del Prete acknowledges that she has not alleged a fabrication claim against defendant Caliendo (who offers no arguments in rebuttal) but "reserves the right to seek to assert a fabrication claim against Caliendo in the event that discovery reveals evidence to support such a claim." Pl.'s Resp., n.13. As detailed above, however, Del Prete's *Brady* argument against Caliendo falls short of establishing that she has a plausible claim against Caliendo under that theory.

he and Kroll contacted Flaherty on January 3, 2003, and that together, knowing medical evidence pointed away from Del Prete, they conspired to fabricate false evidence against her. Am. Compl. ¶¶ 27, 29, 31, 37. In other words, Del Prete has alleged that McLaughlin knew of evidence indicating Del Prete was not responsible for I.Z.'s injuries and still worked with Kroll and Flaherty to devise a damning medical report that would point the finger at Del Prete and omit exculpatory evidence. At the pleading stage, these allegations are sufficient to establish that, at minimum, McLaughlin "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003). The Romeoville Defendants' motion to dismiss based on defendant McLaughlin's lack of personal involvement is therefore denied.

### III.   *Monell* Liability

Del Prete alleges that the individual defendants' due process violations were "undertaken pursuant to the policies and practices" of the Villages of Romeville and Plainfield "to pursue wrongful convictions through profoundly flawed investigations and to fabricate inculpatory evidence and reports and withhold exculpatory information bearing on the crime at issue." Am. Compl. ¶¶ 74-75. These practices flourished because "municipal policy makers with authority … exhibited deliberate indifference to the problem" and because the municipalities "declined to implement sufficient training and/or any legitimate mechanism for oversight and punishment." *Id*. ¶¶ 77-78.

But Del Prete alleges no other instances of employees of the Villages of Romeoville or Plainfield pursuing wrongful convictions via flawed investigations. As the Romeoville Defendants note, while this Circuit "has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice." *Wilson v. Cook Cnty.,* 742 F.3d 775, 780 (7th Cir. 2014) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)). Del Prete counters that the municipal

defendants' failures to train, supervise, investigate and discipline its employees constitute a plausible *Monell* violation. But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train" and "[t]o satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). To establish "deliberate indifference," policymakers must be on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights" and "choose to retain that program" regardless. *Id*. Here, Del Prete has not shown the pattern of injuries "ordinarily necessary" to establish that the Villages of Romeoville and Plainfield knew or should have known that their training was deficient. *Id*. at 62 (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Indeed, Del Prete has alleged no other injuries than her own. The Court cannot infer from her allegations that the municipal defendants were on actual or constructive notice that a failure in training was causing violations of citizens' constitutional rights. Del Prete's due process claims for *Monell* liability against the Villages of Romeoville and Plainfield are therefore dismissed.

## IV. Conspiracy

Citing both federal and state law, the complaint also alleges that the individual defendants conspired together to falsely accuse Del Prete for I.Z.'s injuries. To state a claim based on conspiracy under § 1983, a plaintiff must allege "the parties, general purpose, and approximate date" of the alleged conspiracy "so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). While "a bare allegation of conspiracy" is insufficient to survive a 12(b)(6) challenge, there is no heightened pleading standard for conspiracy, and it is not necessary for a plaintiff to plead specific overt acts taken in furtherance

28

of the conspiracy. *Id*. at 1008 ("Of course, if it became apparent in the course of the litigation that there was no overt act, the plaintiff's suit would have to be dismissed; but a failure of proof is not a failure to state a claim."). Under Illinois common law, pleading an overt act is required, *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 133, 720 N.E.2d 242, 258 (1999), but federal pleading standards govern in federal court, *Cooney v. Casady*, 652 F. Supp. 2d 948, 958 (N.D. Ill. 2009) ("When a federal court entertains state law claims, the federal notice-pleading standard applies."). Federal and state substantive law both agree, however that "the agreement is a necessary and important element of this cause of action." *Id.*

The Romeoville Defendants argue that Del Prete's complaint merely recites the legal elements of a conspiracy without pleading any specific facts to support that allegation. Defendant Flaherty similarly argues that Del Prete's allegations amount to legal conclusions, and that Del Prete "does not identify dates, times, or places where Dr. Flaherty reached a meeting of the minds." Flaherty Memo, 11. The Court disagrees. A "vague and conclusory pleading" alleging generically that a defendant conspired to deprive a plaintiff her constitutional rights would not pass muster under Federal Rule of Civil Procedure 12(b)(6), *Winchester v. Marketti*, No. 11-cv-09224, 2012 WL 2076375, at *5 (N.D. Ill. June 8, 2012), but Del Prete has alleged substantially more detail regarding the defendants' scheme:

- "Although Defendants Kroll and McLaughlin were aware that the medical evidence pointed away from Plaintiff, and possibly toward natural causes, on January 3, 2003, they nonetheless contacted another doctor, Defendant Flaherty, and conspired with her to fabricate evidence that would falsely implicate Plaintiff." Am. Compl. ¶ 31.

- "Defendant Flaherty participated with Defendants Kroll and McLaughlin to fabricate evidence of [SBS] and evidence implicating Plaintiff as the perpetrator." *Id*. ¶ 37.

- "By January 8, 2003, just days after first meeting with Defendants Kroll and McLaughlin, and without conducting any physical examination of I.Z., Defendant

Flaherty authored a report with fabricated scientific findings that I.Z.'s injuries were unequivocally the result of child abuse, specifically shaking, and that those injuries must have occurred while I.Z. was in Plaintiff's care." *Id*. ¶ 38.

- "Defendant Flaherty understood that the purpose of the report was to assist the Defendant Officers' investigation and specifically to pinpoint a perpetrator for the prosecution." *Id*. ¶ 39.

- "Defendants Flaherty willfully participated with the Defendant Officers to secure Plaintiff's arrest and conviction. Defendant Flaherty provided her fabricated report to Defendant Officers and joined their investigation while at the same time involving herself directly in I.Z.'s medical care." *Id*. ¶ 43.

These allegations identify the parties to the conspiracy, its purpose, and its approximate dates, and therefore provide "sufficient notice of the contours of the conspiracy claim," which is all that is "required to survive a motion to dismiss." *Sanchez v. Village of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020).

Defendant Flaherty makes three additional arguments in opposition to Del Prete's conspiracy theory, each of which come up short. First, Flaherty argues she had no way of knowing at the time she authored her report that I.Z. would die and that Del Prete would be charged with murder. This glibly misconstrues Del Prete's allegation, which is that the defendants conspired to implicate Del Prete as the perpetrator of I.Z.'s injuries. Indeed, Del Prete was arrested and charged before I.Z. died. Second, Flaherty argues that she did not control Dr. Harkey's access to records or the opinions he reached. But that is irrelevant. Even if Dr. Harkey did have access to other records and declined to seek them, it would not negate Del Prete's well-pleaded allegation that Flaherty conspired with the other defendants to ensure her arrest. Finally, Flaherty argues that "opinions cannot be fabricated the way physical evidence could be" and that the "more logical … explanation" is that she reviewed medical records and provided her earnest opinion. Flaherty Mem. 11-12. But these are factual arguments inappropriate at the 12(b)(6) juncture. Flaherty may be able to show, at trial or summary judgment, that her opinions were genuine and the product of careful

review of the available evidence. But Del Prete's allegations are taken as true at this stage, and, as discussed *supra*, Del Prete has stated a claim against Flaherty under an evidence-fabrication theory.[12]

## V.    Malicious Prosecution

Del Prete's malicious prosecution theory invokes both the Fourth and Fourteenth Amendments and Illinois common law. The Fourteenth Amendment argument can be disposed of at the threshold: the Seventh Circuit has rejected malicious prosecution claims brought under the Fourteenth Amendment where state law provides an adequate remedy, as Illinois does. *See Ray v. City of Chicago*, 629 F.3d 660, 664 (7th Cir. 2011); *Hernandez v. Guevera*, No. 23-cv-15375, 2024 WL 4299046, at *11 (N.D. Ill. Sept. 26, 2024). No matter. In *Thompson v. Clark*, the Supreme Court expressly endorsed independent malicious prosecution claims brought under the Fourth Amendment. 596 U.S. 36, 42 (2022). Courts in this jurisdiction have since considered such claims. *See Hernandez*, 2024 WL 4299046, at *10; *Gecht v. Guevara*, No. 23-cv-00742, 2024 WL 4299982, at *8-9 (N.D. Ill. Sept. 26, 2024); *Navarro v. City of Aurora*, No. 21-cv-06288, 2022 WL 1988990, at *2 (N.D. Ill. June 6, 2022) (noting that *Thompson* overruled the precedent holding that plaintiffs cannot bring malicious prosecution claims under the Fourth Amendment in Illinois).

---

[12] Having found that Del Prete has stated a claim against Flaherty for conspiracy, the Court must also reject Flaherty's argument that she cannot be liable under § 1983 because she was not a state actor. Private citizens who conspire with state actors are subject to § 1983 liability. *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000). A plaintiff who demonstrates (1) that the private citizen reached an understanding with a state official to deprive the plaintiff of her constitutional rights, and (2) that the private citizen was a willful participant in the joint activity with the state official has established § 1983 liability through a conspiracy theory. *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998). Del Prete has alleged exactly that—that Flaherty willfully agreed with Kroll and McLaughlin to fabricate her opinion that I.Z. must have been shaken by Del Prete, thereby ensuring Del Prete's prosecution.

To state a claim based on Fourth Amendment malicious prosecution, a plaintiff must allege that (1) the prosecution was initiated without any probable cause; (2) the motive in initiating the prosecution was "malicious" (*i.e.*, without probable cause and for a purpose other than bringing the defendant to justice); and (3) the underlying criminal prosecution terminated in favor of the plaintiff. *Thompson,* 596 U.S. at 44. Rather than argue whether Del Prete has pleaded these elements, however, the Romeoville Defendants argue only that Del Prete's malicious prosecution claim is not timely, citing to a footnote in *Thompson* explaining that "[b]ecause this [malicious prosecution] claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff." 596 U.S. at 43 n.2. The Romeoville Defendants argue that a seizure, for purposes of the Fourth Amendment, ends when the plaintiff is released from custody, citing as support *Manuel v. City of Joliet*, 903 F.3d 667 (7th Cir. 2018), and *Smith v. City of Chicago*, 3 F.4th 332 (7th Cir. 2021), *vacated*, 142 S. Ct. 1665 (2022). In those cases, the Seventh Circuit held that the plaintiffs' Fourth Amendment claims accrued when they were released from custody. 903 F.3d at 670; 3 F.4th at 342. Under this approach, Del Prete's claim accrued when she was released from incarceration on bond in 2014, and because the statute of limitations in Illinois for § 1983 claims is two years, was not timely when Del Prete filed suit in 2017.

This view, however, does not square with *Thompson*, which post-dates both *Manuel* and *Smith* and makes clear that a plaintiff bringing a claim for malicious prosecution under the Fourth Amendment must allege a "*favorable termination* of the underlying criminal prosecution." 596 U.S. at 39 (emphasis in original). "[C]laims accrue when a plaintiff has a complete and present cause of action." *Savory v. Cannon*, 947 F.3d 409, 414 (7th Cir. 2020). Del Prete could not have brought her malicious prosecution claim before the favorable termination of the case against her,

which did not occur until the criminal charges against her were dropped. That is the same conclusion the Seventh Circuit came to on rehearing *Smith* after *Thompson*: "After *Thompson*, a Fourth Amendment claim for malicious prosecution accrues when the underlying criminal prosecution is terminated without a conviction." No. 19-2725, 2022 WL 2752603, at *1 (7th Cir. Jul. 14, 2022). The Romeoville Defendants urge the Court to ignore the *Smith* rehearing because it is unpublished and does not deal directly with *Thompson*'s requirement that a plaintiff bringing a claim or relief supported by the Fourth Amendment also be "seized." But Del Prete's complaint is clear that she was "seized," and *Smith* simply looks to *Thompson* for the elements of malicious prosecution in order to determine the proper accrual date. That is the correct approach.

Defendant Flaherty raises a separate argument with regard to Del Prete's Illinois' malicious prosecution theory. "Under Illinois law, to succeed on a malicious prosecution claim, a plaintiff must prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Lund v. City of Rockford*, 956 F.3d 938, 949 (7th Cir. 2020) (quoting *Swick v. Liautaud*, 169 Ill. 2d 504, 662 N.E.2d 1238, 1242 (1996)).

Flaherty disputes the first element, arguing that she cannot be liable for malicious prosecution because "[o]nly state prosecutors can and did decide to initiate those proceedings." Flaherty Mem. 19. Not so. Liability for malicious prosecution extends to anyone who played a "significant role" in causing the prosecution. *Fulton v. Bartik*, 547 F. Supp. 3d 799, 821 (N.D. Ill. 2021). Nor does Illinois law limit that liability to prosecutors or even law enforcement officers; private citizens may be liable for providing false information to law enforcement when that false information serves as the basis for the commencement of criminal proceedings. *See Rodgers v.*

*Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 733 N.E.2d 835, 840-41 (Ill. App. Ct. 2000) (plaintiff stated malicious prosecution claim against private employer and its security firm, which fabricated evidence against the plaintiff and provided that false information to the State's Attorney's Office, leading to his indictment).

Flaherty cites *C.H. v. Grossman*, in which the plaintiffs sought relief under a malicious prosecution theory from a doctor who evaluated a child and concluded their injuries were the result of abuse, leading to the Illinois Department of Children & Family Services ("DCFS") indicting the plaintiff mother for abuse. No. 14-cv-08174, 2015 WL 4554774, at *1-2 (N.D. Ill. Jul. 28, 2015). The court in that case ruled, without much analysis on the issue, that the plaintiffs had not alleged that the defendant doctor had "started a judicial proceeding against them … ." *Id*. at *3. However, the plaintiffs had also failed to allege that the proceeding was commenced without probable cause or that it terminated favorably to them. *Id*. Further, the complaint apparently did not detail how or whether the defendant doctor even communicated her findings to law enforcement. *Id*. at *1. Del Prete, in contrast, has alleged that Flaherty conspired with Kroll and McLaughlin to create a false medical report that was ultimately provided to prosecutors and used to charge and convict her. That is sufficient to allege that Flaherty "commenced" a judicial proceeding. Flaherty has not challenged the other elements of malicious prosecution, and so the Court will not address them. Flaherty's motion to dismiss Del Prete's on this basis is denied.

However, for the reasons detailed in the above analyses, the Court agrees with defendant Caliendo that Del Prete has not alleged that she had a "significant role" in causing the prosecution. As currently alleged, the complaint does not state a plausible claim against her based on a malicious prosecution theory.

Del Prete has therefore stated a plausible claim for relief under the Fourth Amendment—and again, the viability of that theory requires denial of the Romeoville Defendants' motion to dismiss the complaint. And, because Del Prete has adequately pleaded § 1983 liability as to defendant Flaherty for her participation in conspiracy with Kroll and McLaughlin, her motion to dismiss the claim under a federal malicious prosecution claim is also denied. *See Tillman v. Burge*, 813 F. Supp. 2d 946, 990 (N.D. Ill. 2011) ("The very purpose of the conspiracy doctrine is to hold coconspirators liable for the substantive acts of those with whom they have entered a conspiracy."). However, Del Prete has not adequately alleged that defendant Caliendo violated her right to due process either individually or as part of a conspiracy, and so Del Prete's malicious prosecution theory falls short of supporting a plausible claim for relief against Caliendo.

## VI.    Failure to Intervene

Because the court has determined that the complaint sets forth a plausible claim for relief under a variety of theories as to all of the individual defendants other than Officer Caliendo, there is no need to assess the viability of the failure to intervene theory as to any of the individual defendants other than Caliendo, but the Court will do so for the sake of completeness. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know … that any constitutional violation has been committed by a law enforcement official; *and* … had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).[13]   The Romeoville Defendants offer three arguments in support of their motion to

---

[13] But query: "What statute or constitutional rule requires one employee of the government to stop another from making a mistake?" *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) (questioning viability of failure to intervene theory in light of *DeShaney v. Winnebago Cnty. Dep't of Social Services*, 489 U.S. 189 (1989), which held that the

dismiss this claim: (1) Del Prete has not alleged a constitutional violation, (2) the allegations are not plausible because Del Prete does not allege that McLaughlin knew about the Kroll letters, and (3) the allegations are not plausible because Del Prete does not allege that Kroll or McLaughlin could have persuaded Flaherty to change her opinion in order to pursue a conviction. The Court has disposed of the first argument already. As to the second and third, as discussed in Section II.A, Del Prete has adequately pleaded defendant McLaughlin's personal involvement in due process violations and conspiracy, and that Kroll, McLaughlin, and Flaherty conspired together to fabricate false medical opinions. The allegations that the individual defendants were aware of constitutional violations, had opportunities to intervene, and failed to do so therefore *are* plausible, and the Romeoville Defendants' motion to dismiss falls short as to the failure to intervene theory as well. *See Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 789-90 (N.D. Ill. 2013) (where complaint alleged that defendant police officers all participated in the fabrication of evidence, knew that the others were doing so, and failed to intervene to prevent those constitutional violations, plaintiff had stated a § 1983 claim for failure to intervene). Defendant Flaherty makes no argument with respect to the failure to intervene claim, but as detailed above, Del Prete has adequately pleaded her liability under § 1983 for conspiracy and can therefore state a claim for failure to intervene against her.

Defendant Caliendo, however, again argues that Del Prete has failed to allege facts sufficient to show that Caliendo was aware of a constitutional violation or had a "realistic opportunity to intervene." *Yang*, 37 F.3d at 285. The Court agrees. Del Prete argues that "it is a reasonable inference [that] Kroll and Caliendo discussed that they were not going to turn this

---

Due Process Clause imposes no affirmative duty on law enforcement officers to protect members of the general public).

important piece of evidence over to the prosecution." Pl.'s Resp., 28. But the complaint does not support that inference. All Del Prete alleges with respect to Caliendo is that she was present at I.Z.'s autopsy and later told Kroll about Dr. Harkey questioning I.Z.'s SBS diagnosis. Am. Compl. ¶ 50. It stretches the facts alleged too far to assume that the conversation between Caliendo and Kroll was nefarious, as the complaint alleges no other involvement in the investigation by Caliendo.[14] Del Prete has not stated a claim against Caliendo that can be supported by a failure to intervene theory.

## VII.    Intentional Infliction of Emotional Distress

To succeed on a claim for intentional infliction of emotional distress ("IIED") under Illinois law, a plaintiff "must [establish] that (1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010). Outrageous conduct is conduct that is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 607 N.E.2d 201, 211 (1992). A wrongful conviction can be the source of emotional distress for purposes of IIED. *See*

---

[14] Del Prete argues alternatively that she should be able to "elaborate" on her allegations in opposing defendants' motions to directly assert that Kroll and Caliendo discussed that they would suppress the evidence. She cites *Geinosky v. City of Chicago* for the argument that plaintiffs may elaborate on their complaint's allegations "so long as the new elaborations are consistent with the pleadings." 675 F.3d 743, 745 n.1 (7th Cir. 2012). However, *Geinosky* doesn't provide a license to speculate and "does not give plaintiffs carte blanche to amend a complaint through a responsive brief." *Bruno v. Global Experience Specialists, Inc.*, No. 19-cv-06710, 2020 WL 5253139, at *3 (N.D. Ill. Sept. 3, 2020) (holding that facts asserted by plaintiff in opposition to defendant's motion to dismiss would "amount to allowing [plaintiff] to amend the deficient complaint" because the complaint itself was so "sparse"). In any event, Del Prete will have an opportunity to seek leave to amend her complaint and can then supplement her complaint to add allegations about such a conversation between Caliendo and Kroll—if she can do so consistent with Rule 11.

*Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010); *Heidelberg v. Manias*, 503 F. Supp. 3d 758, 793 (C.D. Ill. 2020).

Defendant Flaherty argues that "giving her opinions about I.Z.'s injuries" cannot possibly be extreme and outrageous conduct. Flaherty points again to *Grossman* to argue that when a physician renders an opinion that a child's injuries are caused by abuse, that opinion cannot serve as the basis for relief under an IIED theory. Again, though, the allegations in *Grossman* lacked the substance that Del Prete's do. In *Grossman*, the plaintiffs alleged only that the defendant physician rendered an opinion that the plaintiff's child's injuries were the result of abuse and that the defendant tried to prevent another physician, who had reached another conclusion, from giving his opinion until after the police had finished their investigation. 2015 WL 4554774, at *3. There were no allegations that the defendant physician's opinions were fabricated, and the court held that the plaintiffs had not adequately pleaded conspiracy or personal involvement as to the defendant physician. *Id*. at *2. In contrast, the Court has already determined that Del Prete adequately pleaded that Flaherty conspired with Kroll and McLaughlin to deprive Del Prete her right to due process and fabricated evidence against her. That plausibly alleges extreme and outrageous conduct sufficient to support Del Prete's claim based on an IIED theory. *See Heidelberg*, 503 F. Supp. 3d at 793 (where wrongfully convicted plaintiff stated claims for constitutional violations against defendants, and those defendants "knew their conduct was likely to cause severe distress because they were aware that [plaintiff] was innocent," plaintiff had stated a claim for IIED).

Flaherty also argues, for the first time in her reply brief, that her actions were not the proximate cause of Del Prete's emotional distress. Rather, it was the decision of the prosecutors to pursue charges and of the jury's verdict, which led to Del Prete's conviction. But Del Prete has alleged that "[t]he only medical basis for indicting Plaintiff was Defendant Flaherty's fabricated

report." Am. Compl. ¶ 46. That is sufficient to plead causation at the motion to dismiss stage. Defendant Flaherty's motion as to Del Prete's IIED theory fails to persuade. For similar reasons, the Romeoville Defendants' motion to dismiss, which does not raise any specific arguments with respect to the IIED theory, is also denied.

Again, however, Del Prete's allegation that defendant Caliendo told defendant Kroll about Harkey's questions but failed to write them down in a police report does not rise to the level of extreme and outrageous conduct. Her motion to dismiss this count is granted.

## VIII. Respondeat Superior and Indemnification

Because Del Prete's claim against Kroll and McLaughlin survive, her claim under theories of *respondeat superior* and indemnification against the Village of Romeoville, the employer of Kroll and McLaughlin when they allegedly committed their tortious acts, also survive. *See Tillman*, 813 F.Supp.2d at 981. However, because her claim against Caliendo has been dismissed, so too must be the claim against the Village of Plainfield based on *respondeat superior* and indemnification theories.

## IX. Flaherty Immunity

Defendant Flaherty argues that she is immune from Del Prete's claim, regardless of theory, on the bases of absolute witness immunity and statutory immunity under the Victims of Child Abuse Act, 34 U.S.C. § 20341, *et seq*. Neither apply to Flaherty in this case.

### A. Absolute Immunity

Witnesses who testify in a judicial proceeding are entitled to absolute immunity for their testimony and their preparation for that testimony. *Briscoe v. LaHue*, 460 U.S. 325, 345 (1983); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003); *Curtis v. Bembenek*, 48 F.3d 281, 284-85 (7th Cir. 1995). However, absolute immunity does *not* protect witnesses for their roles in investigating cases. *Stinson*, 868 F.3d at 528. In *Stinson*, discussed *supra* in Section II, the two

forensic odontologists sued for due process violations under § 1983 also argued that absolute immunity shielded them from suit. The Seventh Circuit held that absolute immunity did not shield the odontologists, because the plaintiff's claims were "focused on their actions while [the case] was being investigated, not on their testimony at trial or preparations to testify at trial." *Id*. That is also the case here. Del Prete's allegations target the actions Flaherty took while Del Prete was still being investigated for battery and, later, murder: meeting with Kroll and McLaughlin, conspiring to fabricate evidence, authoring her report, and providing Dr. Harkey with an incomplete record for review. Each of these actions was completed before Del Prete was charged and is independent from her trial testimony and preparation. To see this, we need only consider that none of the conduct that forms the basis of Del Prete's claim that she was framed was incomplete when she was charged or when Flaherty testified. Del Prete's claim is not that Flaherty testified against her falsely; it's that she conspired with the defendant officers to create false evidence on which the charges against Del Prete were ultimately based.

Flaherty cites four decisions within the Seventh Circuit applying absolute immunity to physicians or social workers in child welfare cases. Three pre-date *Stinson*: *Millspaugh v. Cnty. Dep't of Public Welfare of Wabash Cnty.*, 937 F.2d 1172 (7th Cir. 1991); *Vanwinkle v. Nichols*, No. 15-cv-01082, 2015 WL 9275671 (S.D. Ind. Dec. 18, 2015); and *Mohil v. Glick*, 842 F. Supp. 2d 1072 (N.D. Ill. 2012). The two district court cases are not binding in any event, and *Millspaugh* does not aid her cause. *Millspaugh* was not overturned by *Stinson* but involved a defendant child protection case worker who asserted absolute immunity against claims that she improperly pursued a child neglect case against the plaintiff mothers, did not provide the court with material favorable to the plaintiffs at a custody hearing, and did not provide the plaintiffs with adequate notice of hearings. 937 F.2d at 1175. The Court held that absolute immunity applied to those actions because

"social workers and like public officials are entitled to absolute immunity in child custody cases on account of testimony and other steps taken to present the case for decision by the court." *Id*. at 1176. However, other actions the plaintiffs alleged the case worker took outside of court, such as her application for the court order initiating the case and taking custody of the children, were protected only by qualified immunity because "absolute immunity does not protect the gathering of evidence, even though the acts of presenting that evidence to (or withholding it from) the court receive greater protection." *Id*. Del Prete alleges that during the investigation into I.Z.'s injuries, Flaherty fabricated evidence to be used against Del Prete. The creation of that evidence is the basis of Del Prete's claims—not Flaherty's actions at trial or even the use of her report at trial. Those actions are much closer to "the gathering of evidence" contemplated by the *Millspaugh* Court than they are to immune testimony or the "steps taken to present the case for decision by the court." *Id*.

Flaherty also cites *Hayes v. Narang*, which involved a physician who examined an injured child and determined the cause of the injuries to be abuse by her parents. No. 1:19-cv-03596, 2020 WL 4815909, at *2 (N.D. Ill. Aug. 18, 2020). While the physician did not testify, his conclusion (which the plaintiff alleged was "intentionally mischaracterized" and the result of an inadequate investigation) was compiled into a report that DCFS relied upon to initiate removal proceedings. *Id*. at *8. The court held that "his report and the examination culminating in that report should be given the same protection as live testimony." *Id*. But *Hayes* does not address *Stinson*, is not binding on this Court, and did not involve a defendant conspiring with investigators to build a case. The defendant in that case evaluated the child and issued a report with the understanding the DCFS would use it in their removal proceedings. But that is a significant step removed from the active investigatory role Del Prete alleges Flaherty had in this case.

*Stinson* and its progeny leave no doubt that expert witnesses do not "have immunity while collaborating with prosecutorial investigations." *Mabes v. McFeeley*, No. 21-cv-02062, 2022 WL 20357990, at \*9 (S.D. Ind. Sept. 22, 2022) (citing *Stinson*, 868 F.3d at 528); *see also Cusick v. Gualandri*, 573 F. Supp. 3d 1256, 1276 (N.D. Ill. 2021) ("A fair reading of [the plaintiff's] complaint is that the false [expert] reports were prepared during the investigatory stage and later used both to secure an indictment and at trial. … Defendants' conduct during the investigatory stage would not be immune, regardless of whether their reports were ultimately used at trial.").

Flaherty is therefore not immune from suit on the basis of actions she is alleged to have taken while working with Kroll and McLaughlin to build a case against Del Prete. For similar reasons, the Court concludes that Flaherty's argument that she is entitled to absolute expert witness immunity under Illinois law is also inapt. Flaherty cites *Sandler v. Sweet*, but that case involved a report prepared by an expert witness retained by defense counsel during the course of litigation, not an expert witness who assisted state actors in investigating a case as to whom there has been stated a plausible theory of direct and conspiratorial participation in an effort to support false charges against the plaintiff. 2017 IL App (1st) 163313, ¶¶ 3-4, 84 N.E.3d 544, 546-47 (Ill. App. Ct. 2017). While it may be the case that Illinois law also protects statements made as part of a complaint intended to trigger judicial or quasi-judicial proceedings (*see Belluomini v. Zaryczny*, 2014 IL App (1st) 122664, ¶ 27, 7 N.E. 1, 10 (Ill. App. Ct. 2014) *and Parillo, Weiss & Moss v. Cashion*, 181 Ill. App. 3d 920, 537 N.E.2d 851, 857 (Ill. App. Ct. 1989)), in neither case did the court purport to extend that immunity to actions taken by individuals working with law enforcement to *investigate* a criminal case.

### B.    Statutory Immunity

Flaherty also asserts that the Victims of Child Abuse Act immunizes her from suit. The statute protects from liability any individual who "in good faith, provides information or

42

assistance, including medical evaluations or consultations, in connection with a report, investigation, or legal intervention pursuant to a good faith report of child abuse or neglect." 34 U.S.C. § 20342(1). The statute also imposes a "presumption" of good faith on the behalf of anyone criminally charged or civilly sued for their information or assistance with a report of child abuse. *Id*. § 20342(2).

While the statute may cover Flaherty's actions, Del Prete alleges that Flaherty did *not* act in good faith in assisting with the investigation into I.Z.'s injuries. She has pleaded enough— conspiracy and intentional evidence fabrication—to overcome the presumption of good faith the statute provides to Flaherty.

*     *     *

For the foregoing reasons, the motions of the Romeoville Defendants and Dr. Flaherty to dismiss Del Prete's complaint are denied. The Plainfield Defendants' motion to dismiss is granted. A status hearing will be held on February 19, 2025, at 9:30 a.m. in Courtroom 2303.

Date: February 10, 2025

John J. Tharp, Jr.
United States District Judge